## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, <br> 378 N. Main Avenue <br> Tucson, AZ 85701, <br><br>        Plaintiff, <br><br>   v. <br><br> U.S. FISH AND WILDLIFE SERVICE, <br> 1849 C Street N.W. <br> Washington, D.C. 20240, <br><br> MARTHA WILLIAMS, in her official capacity <br> as Director of the U.S. Fish and Wildlife Service, <br> 1849 C Street N.W. <br> Washington, D.C. 20240, <br><br>      and <br><br> DEB HAALAND, in her official capacity as <br> Secretary of the U.S. Department of the Interior, <br> 1849 C Street N.W. <br> Washington, D.C. 20240, <br><br>        Defendants. | Civil Action No.: _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

### INTRODUCTION

1.  Plaintiff Center for Biological Diversity ("Center") challenges the unlawful and arbitrary decision of the U.S. Fish and Wildlife service ("Service") to deny Endangered Species Act ("ESA" or "Act") protections to the bridled darter (*Percina kusha*), a rare freshwater fish that faces myriad threats and an increasing risk of extinction from ongoing harms to the few streams in the southeastern United States where it still remains.

2.  Named for its distinctive facial markings that resemble a horse's bridle, the bridled darter is a quick, slender little fish found only in the headwaters of the Etowah and Conasauga Rivers within the Coosa River basin in northern Georgia and southern Tennessee.

3.      The rapid expansion of the urban and suburban areas of Atlanta and Chattanooga and agricultural development into the surrounding areas have encroached on the bridled darter's already narrow habitat and forced the fish onto an even smaller area. In its vastly reduced range, the bridled darter faces growing and intensifying threats from urbanization, agriculture, and climate change. As such, the Service has predicted that the species' plight will continue to worsen, that two of six bridled darter populations are "very likely" to be lost in the next ten years, and that at least half of the current bridled darter populations are "likely" to be lost by 2070, with small, at-risk remnants in only the farthest upstream reaches of the Coosa River basin.

4.      The Center petitioned the Service in 2010 to protect the bridled darter by listing it under the ESA because the best available science showed that the bridled darter was in danger of extinction (an "endangered" species as defined in the ESA) or, at minimum, likely to become endangered in the foreseeable future (a "threatened" species under the Act).

5.      Despite acknowledging the many intensifying threats and its own predictions of the total loss of at least half the current populations, in 2017, the Service decided that the bridled darter did not warrant protection as an endangered or threatened species. 82 Fed. Reg. 46183 (Oct. 4, 2017).

6.      The Service's decision was arbitrary, capricious, and violated the ESA because it failed to rely on the best available science set forth by the agency's own scientists and outside experts regarding the species; ignored the agency's own proffered timeframe to assess the bridled darter's risk of extinction in the foreseeable future and, instead, substituted a timeframe with no valid explanation or scientific support; failed to determine whether the bridled darter is endangered or threatened in a "significant portion of its range," as the ESA requires and, instead, applied an unlawful policy that has been invalidated by other courts; and failed to properly

consider whether "existing regulatory mechanisms" are adequate to protect the bridled darter, as also required by the Act.

7.    Accordingly, the Center requests that this Court declare the Service's "not-warranted" decision for the bridled darter to be arbitrary and capricious and unlawful under the ESA, vacate the illegal decision, and remand the decision to the Service with direction to determine whether the best available science supports protecting the bridled darter as endangered or threatened species, by a date certain.

## JURISDICTION AND VENUE

8.    Plaintiff brings this action under the ESA, 16 U.S.C. § 1533, 1540(g), and the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

9.    This Court has jurisdiction under 16 U.S.C. § 1540(c), (g), and 28 U.S.C. § 1331 and 28 U.S.C. §1346. The Court may grant relief requested under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201-2202; and 5 U.S.C. §§ 704, 706.

10.    Venue in the U.S. District Court for the District of Columbia is proper because Defendants reside in this district. 16 U.S.C. § 1540(g)(3)(A); 28 U.S.C. § 1391(e).

11.    Plaintiff provided the Service and the Secretary of the U.S. Department of the Interior with notice of intent to sue for ESA violations on April 7, 2021, and supplemented the notice on July 25, 2023, more than 60 days prior to filing this Complaint. Defendants have failed to remedy their continuing violations of the ESA by the date of this Complaint's filing. Therefore, an actual and present controversy exists between the parties under 28 U.S.C. § 2201.

## PARTIES

12.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit environmental organization dedicated to protecting endangered species and their habitats through

science, policy, and law. The Center is headquartered in Tucson, Arizona, with offices in numerous other locations throughout the country. The Center has more than 87,000 members. The Center's members are deeply interested in and committed to conservation of imperiled species and the effectiveness of the ESA to protect those species. The Center brings this action on behalf of its organization and its members who derive ecological, recreational, scientific, professional, and other benefits from the bridled darter, its aquatic habitat, and the health of the Coosa River basin, upon which the bridled darter relies for its continued survival. The Center has members who live near and/or visit areas in the Etowah and Conasauga River watersheds, where bridled darters are known or believed to exist, with the hope of viewing the fish.

13.     Center member Dr. Bernard Kuhajda is an ichthyologist and aquatic conservation biologist with the Tennessee Aquarium's Conservation Institute who has been interested in the bridled darter for eleven years and has been intensively studying the bridled darter for the last three years. Dr. Kuhajda frequently leads snorkel surveys to study bridled darters in the Conasauga and Etowah River systems and has observed first-hand the deteriorating stream habitat conditions for the species. Dr. Kuhajda believes the bridled darter may soon be gone forever from many or all streams where it lives due to ongoing habitat degradation—by sedimentation, siltation, pollution, and other factors—that has already caused the fish to disappear from several areas. This is causing ongoing harm and will continue to cause harm to Dr. Kuhajda's recreational, professional, and aesthetic interests in the bridled darter.

14.     Center member Dr. James D. Williams is a freshwater biologist who worked in the Service's Office of Endangered Species in Washington, D.C., from 1974 to 1987. During that time, Dr. Williams completed research, undertook specific analyses, and prepared agency decision documents for more than 35 candidate endangered and threatened fish species

throughout the United States. From 1987 to 2000, Dr. Williams served as Chief of the

Biodiversity Branch of the Service's and the U.S. Geological Survey's ("USGS") Research Lab

in Gainesville, Florida. Dr. Williams retired from the USGS's Florida Integrated Science Center

in January 2006 and worked with the Florida Fish and Wildlife Conservation Commission from

2008 to 2015. Since that time, Dr. Williams has worked as a pro bono research biologist and has

authored and co-authored more than 100 research publications and books on freshwater fauna,

including the bridled darter. Dr. Williams has travelled to streams within the upper Coosa River

basin in northern Georgia to observe rare darters, including the bridled darter, many times

through his career and plans to continue to do so, and he and his team first described the species

after collecting and studying it in 2007. Dr. Williams is currently working on research in northern

Georgia regarding rare mussels that share habitat with the bridled darter, and he believes that the

health of freshwater mussels and fish are so intertwined that any harm to one is harm to the other.

Dr. Williams is aware of the extensive development occurring in the areas around the streams in

the upper Coosa River basin where the bridled darter lives, and he believes that the resulting

sedimentation and siltation impacts will destroy the habitat and hurt the bridled darter. This is

causing ongoing harm and will continue to cause harm to Dr. Williams's professional, aesthetic,

and ethical interests in the conservation of the bridled darter.

15.     The Center and its members are harmed by the Service's unlawful decision that

listing the bridled darter as an endangered or threatened species is not warranted under the ESA

and by the Service's failure to afford the bridled darter the protections of the Act. The injuries

described are actual, concrete injuries presently suffered by the Center and its members, and they

will continue to occur unless this Court grants relief. The relief sought herein—including an

Order vacating the decision and remanding to the Service to issue a new decision based on the

best available science—would redress those harms. The Center and its members have no other adequate remedy at law.

16.     Defendant U.S. FISH AND WILDLIFE SERIVCE is a federal agency of the U.S. Department of the Interior. The Secretary of the Interior has delegated authority to the Service to conserve non-marine endangered and threatened species under the ESA.

17.     Defendant MARTHA WILLIAMS is the Director of the U.S. Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law. The Center sues Defendant Williams in her official capacity.

18.     Defendant DEBRA HAALAND is the Secretary of the U.S. Department of the Interior and has the ultimate responsibility to administer and implement the provisions of the ESA regarding the bridled darter and to comply with all other applicable federal laws. The Center sues Defendant Haaland in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### I.      Endangered Species Act

19.     Recognizing the importance of protecting biodiversity from human activities, Congress enacted the ESA in 1973 to provide "a program for the conservation of … endangered species and threatened species" and "a means whereby the ecosystems upon which [such] species depend may be conserved." 16 U.S.C. § 1531(b). As the Supreme Court has declared, the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 180 (1978).

20.     The Secretary has delegated the administration of the ESA to the Service for freshwater aquatic species such as the bridled darter. 50 C.F.R. § 402.01(b).

21.     Section 4 of the ESA requires the Service to protect imperiled species by listing them as "endangered" or "threatened." *Id.* § 1533(a)(1).

22.     A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* §1532(6). A species is "threatened" if it is "likely to become an endangered species within the foreseeable future." *Id.* § 1532(20).

23.     The ESA does not define "significant portion" of a species' range. *See generally* 16 U.S.C. § 1532. In 2014, the Service promulgated a "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Act's Definitions of 'Endangered Species' and 'Threatened Species.'" 79 Fed. Reg. 37578 (July 1, 2014) ("SPR Policy"). The SPR Policy provided that a portion of a species' range would only be deemed "significant" if, without that portion, the entire species would go extinct or become endangered. *Id*. Courts have subsequently held that this definition unlawfully failed to accord the phrase "significant portion of its range" any independent meaning and thus invalidated the Policy on that basis.

24.     Along with the now-vacated definition of "significant portion," the SPR Policy also provides that "a key part" of the Service's analysis is "whether the threats are geographically concentrated in some way." *Id.* at 37586.

25.     The SPR Policy interprets the term "range" as "the general geographical area within which the species is currently found." *Id.* at 37583. Therefore, while the Service does not "base a determination to list a species on the status (extirpation) of the species lost in the historical range," the SPR Policy directs that "evaluating the effects of lost historical range on the viability of the species is an important component of evaluating the current status of the species." *Id.* at 37584.

26.     The ESA does not define "foreseeable future" as used in the Act's definition of a threatened species. The Service interprets the "foreseeable future" as the timeframe in which the Service "can reasonably determine that both the future threats and the species' response to those threats are likely." 50 C.F.R. § 424.11(d). The Service determines the foreseeable future "on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability." *Id.*

27.     The Solicitor of the Department of the Interior issued guidance interpreting "foreseeable future," clarifying that the appropriate foreseeable timeframe will vary based on the species and the threats it faces and that "the Secretary should not use an arbitrary 'default' time period that is either absolute (e.g., 25 years) or based solely on the generation time of the species at issue." Solicitor of Dep't of Interior, *The Meaning of "Foreseeable Future" in Section 3(20) of the Endangered Species Act*, M-37021 at 13 (Jan. 16, 2009), available at https://www.doi.gov/sites/doi.opengov.ibmcloud.com/files/uploads/M-37021.pdf.

28.     The ESA defines "species" to include "subspecies" and "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

29.     In making listing determinations, the Service must assess threats to the species based on five listing factors: (A) the present or threatened destruction, modification, or curtailment of the species' habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence. *Id.* § 1533(a)(1).

30.     The Service must list a species if the species meets the definition of "endangered" or "threatened" due to "any one or a combination of" the five listing factors. 50 C.F.R. § 424.11(c); *see* 16 U.S.C. § 1533(a)(1).

31.     The Service must make listing determinations "*solely* on the basis of the best scientific and commercial data available[.]" 16 U.S.C. § 1533(b)(1)(A) (emphasis added).

32.     The requirement that the Service base listing determinations "solely" on the "best scientific and commercial data available," *id.*, means that the Service cannot invoke scientific uncertainty to justify its refusal to list a species as endangered or threatened and that the Service must consider all available data, even if it does not provide clarity or absolute certainty.

33.     When most of a species' historic range has been lost and threats to all or a "significant portion" of its current range are ongoing, the Service must explain why the species should not be protected as a listed species.

34.     The ESA's substantive protections apply only once the Service lists a species as endangered or threatened. For example, section 7 of the ESA requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any listed species or "result in the destruction or adverse modification" of a species' "critical habitat." *Id.* § 1536(a)(2). Section 9 of the ESA prohibits, among other things, "any person" from intentionally or incidentally taking listed species without a lawful authorization from the Service. *Id.* §§ 1538(a)(1)(B), 1539. Other provisions require the Service to designate critical habitat for listed species, *id.* § 1533(a)(3); require the Service to develop and implement recovery plans for listed species, *id.* § 1533(f); authorize the Service to acquire land for the protection of listed species, *id.* § 1534; and authorize the Service to make federal funds available to states to assist in efforts to preserve and protect endangered and threatened species, *id.* § 1535(d).

35.     The ESA allows any interested person to formally petition the Service to list a species as endangered or threated. *Id.* § 1533(b)(3)(A); 50 C.F.R. § 424.14(a).

36.     To ensure the timely protection of species at risk of extinction, Congress set forth a detailed process with mandatory, nondiscretionary deadlines for the Service to list a species as endangered or threatened. The three required findings, described below, are the 90-day finding, the 12-month finding, and for the species that the Service determines warrant protection, the final listing determination.

37.     Upon receiving a listing petition, the Service must, "to the maximum extent practicable, within 90 days" make an initial finding as to whether the petition "presents substantial scientific or commercial information indicating that the potential action may be warranted." 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14(h)(1). If the Service finds that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected, and the process ends.

38.     If, on the other hand, as in this case, the Service determines that a petition presents substantial information indicating that listing may be warranted, the agency must publish its finding and conduct a full scientific review of the species' status. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.14(h)(2).

39.     Upon completion of the species' status review, and within twelve months from the date that it received the petition, the Service must make one of three "12-month findings": (1) listing is "warranted"; (2) listing is "not-warranted"; or (3) listing is "warranted but precluded" by other pending proposals to list, delist, or reclassify the status of the listing species. 16 U.S.C. § 1533(b)(3)(B)(i)-(iii).

40.     Under internal policy created without public notice and comment, the Service uses a "species status assessment" ("SSA") to inform the agency's listing decision. U.S. Fish & Wildlife Service, *Species Status Assessment Framework: An Integrated Framework for Conservation*, FWS.gov (Aug. 2016), available at https://www.fws.gov/sites/default/files/documents/species-status-assessment-fact-sheet-2016.pdf.

41.     If the Service issues a 12-month finding that listing the species is "warranted," it must promptly publish its finding in the Federal Register and provide a "general notice and the complete text of a proposed regulation" to list the species as endangered or threated. 16 U.S.C. § 1533(b)(3)(B)(ii). Within one year of publishing a "warranted" finding and proposed rule, the Service must publish the final regulation listing the species along with a final designation of critical habitat for the species. *Id.* §§ 1533(a)(3), (b)(6)(A), (b)(6)(C).

42.     If on the other hand, as in the case of the bridled darter, the Service issues a 12-month finding that listing is "not warranted," the Service rejects the petition, and the process ends. A "not warranted" finding is subject to judicial review. *Id.* §§ 1533(b)(3)(C)(ii), 1540(g).

## II.     Administrative Procedure Act

43.     While the ESA provides for judicial review of a "not-warranted" decision, *id.* § 1540(g), reviewing courts apply the APA standard of judicial review, 5 U.S.C. §§ 701-706.

44.     Under the APA, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

45.     An agency decision is arbitrary and capricious if it relied on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible

11

that it cannot be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

**I.      The Bridled Darter and Threats to Its Continued Existence**

46.      The bridled darter (*Percina kusha*) is a slender, agile little fish that grows to be a maximum of three inches long and can live up to three years. Its species name "*kusha*" comes from the Choctaw word for cane or canebreak, which is also the origin of the name of the Coosa River, the bridled darter's home watershed.

47.      The bridled darter has a pearly yellowish gold to pale brown back and a series of overlapping, elongated dark oval spots forming a lateral stripe running from nose to tail down each side.



48.      Named for its distinctive facial markings that resemble a horse's bridle and reins, the "bridled" darter displays dark markings in front of and behind its eyes that connect to the lateral stripe.

49.     The bridled darter is endemic to the headwaters of the Coosa River basin, found only in the main channels and a few tributaries of the Conasauga River and Etowah River in northern Georgia and southern Tennessee.

50.     Although its historic range was once more expansive within the Coosa River basin, the bridled darter no longer occupies many downstream areas where it once lived and is largely restricted to upstream reaches in the headwaters.

51.     The extent of stream areas historically occupied by the bridled darter has shrunk.

52.     Although the bridled darter has been collected in each of its six streams, most of the reaches occupied by the bridled darter have contracted from 33 to 66 percent.

53.     Bridled darters spawn between mid-April and early-June. Males compete to mate with females, and spawning begins once a spawning site is chosen and pairs are made. During spawning, females bury their bodies and lay eggs in sandy substrates.

54.     To successfully spawn, feed, and hide from predators, the bridled darter needs stream habitats with clear water, free from fine sediments and other pollutants, and high levels of dissolved oxygen ("DO"), as well as instream woody structures and silt-free sand, gravel, cobble, and bedrock substrates.

55.     The bridled darter is known as a "sight feeder" fish, relying on its eyesight and the water's clarity to find and consume prey, and feeds both within the water column and by plucking food from the streambed. To feed, the bridled darter typically positions itself downstream of rocks and away from fast currents to feed on invertebrates, such as mayfly nymphs and blackfly larvae, as they are washed downstream.

56.     The widespread reduction of the bridled darter's occupied habitat has been driven by myriad human-caused impacts.

13

57.     Bridled darters are particularly sensitive to poor water quality, as well as extreme fluctuations in both water quality and quantity. Low flows can cause the buildup of excess sediments, nutrients, and other contaminants, which causes temporary eutrophication and low DO that can kill bridled darters. High flows and flooding can scour river channels and destroy streambeds and riparian areas that are essential for the bridled darter and its habitat.

58.     Sedimentation, or the addition of fine sediments to streams, lowers DO levels and fills the nooks and crevices between rocks and logs where bridled darters typically find food and take refuge. Sedimentation also directly harms bridled darters by causing gill damage, reducing visibility for feeding and spawning, eliminating or reducing suitable spawning habitats, and harming or preventing successful spawning when fine sediments smother and kill eggs.

59.     Habitat connectivity is critical to the bridled darter's long-term survival, as the ability to move between habitats allows the fish to repopulate areas where it has been extirpated.

60.     Connection between bridled darter populations and habitats is also crucial for facilitating gene dispersal, maintaining genetic variability, and passing on beneficial adaptations.

61.     Dams have significantly reduced habitat connectivity across the bridled darter's range and, thus, have severely limited the species' ability to withstand local stochastic events.

62.     As the Atlanta and Chattanooga metropolitan areas continue to grow at a rapid pace, urbanization threatens what remains of the bridled darter's narrow habitat.

63.     With increased urban growth comes increased demand for drinking water, and the resulting water management actions and infrastructure developed directly in streams—such as dams and reservoirs—threaten the bridled darter by reducing habitat connectivity, increasing sedimentation, destabilizing riverbanks, and directly destroying stream habitat.

64.     In areas spared from urban development, agriculture further threatens to destroy the bridled darter's remaining stream habitat. Past agricultural practices have seriously degraded water quality in the region, in particular due to decades-long use of harmful pesticides and herbicides, such as glyphosate, DDT, and DDT degradation products.

65.     The expansion of poultry farming across the region has introduced excess nutrients and endocrine disruptors like estrogen into waterways, further degrading water quality and directly threatening the bridled darter's reproductive behaviors.

66.     The few streams where the bridled darter remains are at risk due to sedimentation from agriculture, construction activities, stormwater runoff, unpaved roads, logging and forestry activities, utility crossings, and mining.

67.     Loss of vegetation along streams ("riparian areas") occupied by the bridled darter further threatens its instream habitat. Damage to riparian areas can destabilize stream banks, increase sedimentation and turbidity instream, reduce the stream's ability to trap contaminants and nutrients from runoff, and increase light penetration and stream temperatures. In turn, this increases algae and reduces woody debris and leaf litter, further removing habitat sources for the bridled darter and its prey.

68.     Climate change and related extreme weather events, particularly category 5 hurricanes and droughts, are expected to increase across the southern United States and dramatically affect stream flows within the bridled darter's range. Intense storms can increase stream flows that scour stream beds, wash out eggs and larvae, stress adult fish, and overall reduce the quality of instream habitat. Droughts cause low flows that can drive population declines, habitat loss, reduced water quality (decreased DO and high temperatures) leading to death, crowding of individuals leading to stress, and decreased spawning success.

69.     Experts on the bridled darter have declared it to be endangered.  For example, in a leading study, James D. Williams *et al.* (2007) concluded that the bridled darter is endangered due to "its very limited distribution in portions of two small rivers and threats to its habitat from municipal and industrial development and forestry and agriculture activities." The International Union for Conservation of Nature ("IUCN") lists the bridled darter as endangered, *see* https://www.iucnredlist.org/species/202581/19032676. The State of Georgia also lists the bridled darter as endangered.

## II.     The Service's Response to the Center's Petition to List the Bridled Darter

70.     In 2010, the Center petitioned the Service to list the bridled darter as endangered or threatened due to many threats, including ongoing and threatened habitat destruction, climate change, and pollution, and because existing regulations are inadequate to address the threats.

71.     In 2011, the Service published a positive 90-day finding that listing the bridled darter "may be warranted" and acknowledged threats to the species due to habitat loss and destruction, pollution, climate change, and other natural or manmade factors, and the inadequacy of existing regulatory mechanisms to address the threats. 76 Fed. Reg. 59835 (Sept. 27, 2011).

## III.    The Service's Species Status Assessment Described the Bridled Darter's Imperiled Status

72.     Over six years later, in 2017 the Service issued the *Species Status Assessment Report for Bridled Darter* ("SSA")*.*

73.     The Service described its SSA for the bridled darter as an "in-depth review of the species' biology and threats, an evaluation of its biological status, and an assessment of the resources and conditions needed to maintain long-term viability." The Service generally states that it uses these reports to summarize the best scientific and commercial information available for a species.

74.     In the SSA, the Service summarized the bridled darter's life history and habitat requirements and described the threats to the bridled darter and its habitat.

75.     The SSA analyzed the current condition of each six populations of bridled darter: Conasauga River, Holly Creek, Talking Rock Creek, Long Swamp Creek, Amicalola Creek, and the Etowah River.

76.     The Service analyzed the current and future viability of the bridled darter using three principles of conservation biology: resiliency, representation, and redundancy.

77.     According to the SSA, "resiliency" refers to a species' ability to withstand stochastic events. The SSA stated that the bridled darter has an inherently low resiliency due to its small populations and limited distribution. The SSA concluded that each population of bridled darters has low resiliency and overall "low" condition due to low abundance, low occurrence, and low habitat conditions.

78.     According to the SSA, "representation" describes a species' ability to adapt to changing environmental conditions and is determined by the level of genetic and environmental diversity within and among populations. Explaining that all bridled darter populations have low resiliency, the SSA determined that the bridled darter also has low representation due to its limited distribution in only six watersheds, the pervasive lack of habitat connectivity, and the species' confinement to only the upper reaches of watersheds.

79.     According to the SSA, "redundancy" refers to a species' ability to withstand catastrophic events such as hurricanes or other extreme weather occurrences. According to the SSA, because all bridled darter populations have low resiliency, the fish therefore has low redundancy. In particular, "the overall lack of connectivity between populations" increases the impact of localized stochastic events such that the bridled darter "species as a whole is less

robust to smaller, more probable, and potentially more frequent stochastic events," and, as a result "a key component of resiliency—the minimization of the effect of localized extirpation—is not met."

80.     In the SSA, the Service applied the same 3 R's analysis to predict the future condition of each bridled darter population under three scenarios over a fifty-year period: the "Status Quo" scenario, the "Best Case" scenario, and the "Worse Case" scenario.

81.     In the Status Quo scenario, the Service assumed that for the next fifty years, the current environmental regulations and policies, land use management techniques, and conservation measures will remain unchanged. Urbanization in one area of the bridled darter's range would see approximately 165 percent growth, increasing demand for water resources. On pace with current trends, the Service anticipated declines in habitat and water quantity and quality as a result of the continued rapid urbanization, ongoing agricultural practices, climate change, and an overall lack of voluntary conservation measures being implemented.

82.     Based on these criteria, the Service predicted that in the Status Quo scenario, two of the six bridled darter populations will be extirpated: Talking Rock Creek and Long Swamp Creek. The Service predicted that the four remaining populations will be in "low" overall condition, and that Holly Creek will face a high risk of extirpation. (See Table below from SSA).

| | Approximate Abundance | Occurrence Extent | Occurrence Complexity | Physical Habitat | Connectivity | Water Quality | Hydrologic Regime | Overall Condition |
|---|---|---|---|---|---|---|---|---|
| Conasauga River | Moderate | Low | Low | Low | High | Low | Moderate | Low |
| Holly Creek | Moderate | Low | Low | Low | High | Low | Low | Low |
| Talking Rock Creek | 0 | 0 | 0 | Low | High | Low | Low | Extirpated |
| Long Swamp Creek | 0 | 0 | 0 | Low | Low | Low | Low | Extirpated |
| Amicalola Creek | Moderate | Low | Low | Moderate | High | Moderate | Moderate | Low |
| Etowah River | Low | Low | Low | Moderate | High | Moderate | Moderate | Low |

83.     In the SSA, the Service determined that the Status Quo scenario is "very likely" (greater than 90 percent certainty) to occur within ten years and "likely" (70 to 90 percent certainty) to occur within fifty years.

84.     In the Best Case scenario, which the Service determined was "unlikely" (10 to 40 percent certainty) to occur in either ten or fifty years, the Service assumed wider adoption of conservation measures and policies that could improve water quality and reduce the effects of rapid urban growth on the bridled darter and its habitat. The Service also relied on the unrealistic (and erroneous) assumption that carbon emissions would peak before 2020, reducing the probability of extreme weather events linked to climate change.

85.     As a result, in the "unlikely" Best Case scenario, the Service determined that all populations would remain in either "low" or "moderate" condition.

86.     In the Worst Case scenario, the Service assumed that rapid urban growth would cause "major negative effects" in aquatic ecosystems and that there would be a 250 percent increase in urban areas, combined with a general lack of conservation measures and increased demand for water resources, higher carbon emissions and increased likelihood of extreme weather events linked to climate change, increased pollution from agricultural herbicide use and the spreading of "poultry litter"—or the mix of bedding material, manure, and feathers that result from intensive poultry production—and little to no protections for water quality. As a result, the Service anticipated a decline in available bridled darter habitat, population size, and abundance.

87.     Based on these criteria, the Service predicted that in the Worst Case scenario, three of the six bridled darter populations will be extirpated: Holly Creek, Long Swamp Creek, and Talking Rock Creek. All remaining populations will be in "low" overall condition, facing high risk of extirpation. (See Table below from SSA).

|  | Approximate Abundance | Occurrence Extent | Occurrence Complexity | Physical Habitat | Connectivity | Water Quality | Hydrologic Regime | Overall Condition |
|---|---|---|---|---|---|---|---|---|
| Conasauga River | Moderate | Low | Low | Moderate | Moderate | Moderate | Moderate | Low |
| Holly Creek | 0 | 0 | 0 | Low | Moderate | Low | Low | Extirpated |
| Talking Rock Creek | 0 | 0 | 0 | Moderate | Moderate | Moderate | Moderate | Extirpated |
| Long Swamp Creek | 0 | 0 | 0 | Low | Low | Low | Low | Extirpated |
| Amicalola Creek | Low | Low | Low | Moderate | Moderate | Moderate | Moderate | Low |
| Etowah River | Low | Low | Low | Moderate | Moderate | Low | Low | Low |

88.     In the SSA, the Service determined that the Worst Case scenario is "as likely as not" (40 to 70 percent certainty) to occur in ten years and "likely" (70 to 90 percent certainty) to occur in fifty years. The SSA determined that, over fifty years, the "Worst Case scenario" is therefore more likely to occur than the "Best Case scenario" and just as likely to occur as the Status Quo Scenario.

89.     The SSA therefore concluded that under the two most likely scenarios, either two or three of the remaining six populations would be completely lost, and that "[r]esiliency, representation, and redundancy declined in both these scenarios due to further range contractions and increased likelihoods for extreme climatic events to impact populations."

## IV.    The Service's Decision that the Bridled Darter is "Not Warranted" For ESA Listing

90.     On October 4, 2017, the Service issued its 12-month finding that listing the bridled darter as endangered or threatened and protecting it under the ESA is "not warranted."

91.     The Service based its "not warranted" decision on the assertion that the bridled darter "continues to persist" in all streams it occupied historically. This assertion ignores the fact that many threats to the species have already eliminated suitable habitat, that the species' range has already dramatically shrunk, and that the bridled darter has been reduced to only the uppermost reaches of streams.

92. The Service did not adequately consider or explain whether the bridled darter will be able to "persist" throughout all or a significant portion of its range as the myriad threats it faces are expected to continue or worsen in the future.

93. The Service relied on speculation and conjecture in finding that the bridled darter's low abundance can be explained by the fact that the fish is "naturally rare and difficult to detect." Neither the Service's published finding nor the SSA presented any data to support the proposition that the bridled darter's present low abundance is due to the species being "naturally rare and difficult to detect."

94. In its finding, the Service stated that "uncertainty" about the bridled darter's abundance and trends somehow supported rejecting listing as endangered or threatened.

95. In fact, the literature cited by the finding and the SSA provides no relative abundance data, and the only trend described for the bridled darter is that the extent of habitat occupied by the species has declined and is continuing to decline.

96. In describing the future conditions of the bridled darter, the Service's finding refers to the Status Quo scenario as the "most likely scenario", and states that under this scenario, "we expect that the bridled darter will still persist in four of six populations," *i.e.*, one-third of the current populations will be entirely lost, within only ten years.

97. The finding does not explain why the agency's decision is not also based on the Worst Case scenario—in which three populations will be lost—and which the SSA found as "likely" to occur as the Status Quo scenario over the next fifty years. The Service's finding also asserts that the Status Quo is the "most likely scenario" over a fifty-year time frame, thus contradicting the SSA's finding that the Status Quo and Worst Case scenarios are equally likely over that time frame.

98.    Despite the SSA using both a ten-year and a fifty-year timeframe to forecast the likelihood of future scenario models for the bridled darter and concluding that extirpations of two or three populations are "likely" within those timeframes, the Service's finding concluded that "20 years is the foreseeable future timeframe for the bridled darter."

99.    In applying this twenty-year "foreseeable future" timeframe, the Service ignored and failed to reasonably explain its deviation from the future conditions described in the SSA and instead relied on unsupported assertions that it would be "speculative" to forecast "beyond eight to ten generations" due to "uncertainty when predicting the species' response to threats in the future." The Service did not explain how the species' "response to threats" such as pollution, sedimentation, pesticides, development, climate change, and other ongoing threats could be expected to change for the better beyond twenty years, and there is nothing in the SSA, or any other scientific literature, to support such conjecture.

100.    Even applying a twenty-year timeframe as the foreseeable future, under the Status Quo scenario presented in the SSA, two of six populations are "very likely" to be entirely lost in only ten years, and myriad threats, including very low population abundance, will continue to plague the remaining populations. Nothing in the Service's published finding concludes otherwise. Yet despite that prediction, based on the Service's own assessment of the best available science, the Service concluded that the bridled darter is not endangered or threatened in "all" or even a "significant portion of its range." In reaching its conclusion, the Service did not explain why the anticipated loss of at least one-third of the existing low-abundance populations does not constitute a "significant portion" of the species' range. The Service's finding expressly relied on the agency's Final SPR Policy, which has been deemed unlawful and invalidated by

multiple courts on the grounds that it improperly reads the language "significant portion of its range" out of the statutory definition of endangered and threatened species.

101.    The Service's finding that the bridled darter is not endangered or threatened in a significant portion of its range relied on the assertion that there "is not a meaningful geographic concentration of threats," and that the "threats affecting the bridled darter are occurring throughout its entire range." This rationale is contradicted by the Service's own finding that the species faces a greater and more immediate risk of extirpation in some populations than others.

102.    In reaching its conclusion that the bridled darter is not even imperiled in a significant portion of its range, the Service failed to consider the ability of different populations to withstand the same kinds of threats. The SSA's prediction and the Service's finding that at least two populations are expected to be extirpated within the foreseeable future, with threats continuing at their present rates under the "Status Quo" scenario, necessarily means that some populations face a more dire "concentration of threats" than other populations.

103.    The Service failed to consider that the best available data reflects that different bridled darter populations or portions of the bridled darter's range do experience different concentrations of threats. For example, the downstream portions of the bridled darter's range are significantly more impacted by urbanization and agriculture, and the Talking Rock Creek and Long Swamp Creek populations are both more affected by mining, which does not occur in other portions of the bridled darter's range.

104.    The Service's finding cited the bridled darter's presence on lands managed by the U.S. Forest Service but failed to explain how the species' presence ameliorates the serious threats that it faces. The Service asserted that Forest Service lands are "noted for having good water quality and suitable habitat," without addressing the water quality in the areas actually occupied

by the bridled darter. The Service's finding also asserts, without proffering any scientific support, that the Service "expect[s] this situation to continue into the foreseeable future."

105.    The Service failed to consider that portions of streams downstream of lands managed by the Forest Service enjoy no meaningful protections such that the bridled darter may be further restricted to only the farthest upstream reaches of its range. Nor did the Service consider that constricting the species in its most upstream habitats makes populations even more vulnerable to extirpation from stochastic events.

## CLAIM FOR RELIEF

### *Violation of the ESA and/or the APA in Determining that Listing the Bridled Darter as an Endangered Species is "Not Warranted"*

106.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

107.    The Service's decision that the bridled darter does not warrant listing as an endangered or threatened species, based on the species' status in all or a significant portion of its range, violates the ESA and is arbitrary and capricious within the meaning of the APA.

108.    The Service failed to consider and apply the best available science when it relied on claims that the bridled darter will continue to persist in its historically occupied watersheds, despite noted uncertainty about population abundance due to the absence of population data.

109.    Under the Status Quo scenario, which the Service characterized as "very likely" to occur within ten years and "likely" to occur within fifty years, two populations of bridled darters will be lost. In the Worst Case scenario, which the Service also characterized as "as likely as not" to occur within ten years and "likely" to occur within fifty years, only four of six or three of six bridled darter populations will exist in the foreseeable future, respectively.

110.    Despite the predicted loss of half or nearly half of the populations and noted increasing threats, the Service irrationally concluded that the bridled darter will "still persist"

such that it is "not in danger of extinction nor likely to become endangered within the foreseeable future."

111.    The Service failed to provide a rational explanation for this decision. The Service's finding makes no mention of available scientific information showing that the "very likely" loss of two populations in the next ten years under Status Quo conditions, or the "likely" loss of three of six populations under the Worst Case conditions, which the Service arbitrarily disregarded, does not render the species endangered or threatened.

112.    The Service's default twenty-year foreseeable future timeframe is arbitrary and unlawful because the Service failed to consider that the best available science indicates that within ten years it is "very likely" that two populations will be lost under Status Quo scenario conditions, and that under the Status Quo and Worst Case scenarios, in fifty years it is "likely" that either two or three populations will be extirpated, respectively.

113.    Furthermore, the Service unlawfully asserted "uncertainty" in predicting the species' response to threats in the future and the absence of direct threats to the species, providing no scientific support or rational explanation for such assertions.

114.    The Service arbitrarily determined that the bridled darter is not threatened or endangered in a significant portion of its range by relying on an unlawful policy that has been invalidated by other courts. The Service applied the incorrect standard that there are no "meaningful geographic concentrations of threats" and failed to consider or rationally explain that different populations will have disparate responses to the same threats.

115.    The Service arbitrarily rendered the phrase "significant portion of range" superfluous by concluding that a portion of the bridled darter's range can only be significant if its

loss would threaten extinction of the species as a whole, a reading that has been repeatedly rejected and judicially invalidated.

116.    The Service categorically failed to consider the impacts of the bridled darter's lost historical range, as well as the additional expected extirpations, on the remaining populations' ability to "persist."

117.    The Service also failed to rationally consider whether existing regulatory mechanisms are adequate to protect the bridled darter when it failed to meaningfully explain how Forest Service land management practices will be adequate to protect the bridled darter and its habitat from increasing threats, particularly given the species' vulnerability to stochastic events and projected declines or extirpations in its downstream habitats.

118.    For these and additional reasons, the Service's decision that listing the bridled darter as an endangered or threatened species is not warranted violates the ESA and is otherwise arbitrary and capricious, an abuse of discretion, and otherwise contrary to law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Declare unlawful the Service's October 4, 2017 decision that listing the bridled darter as threatened or endangered under the ESA is not warranted;

2.    Vacate the Service's "not warranted" decision for the bridled darter;

3.    Remand the decision to the Service for further analysis and a new determination of whether the best available scientific information and data indicates that listing the bridled darter is warranted by a date certain, consistent with the ESA, APA, and this Court's order;

4.    Order the remand to be completed within a time frame set by the Court.

5.      Award Plaintiff reasonable attorneys' fees and costs; and

6.      Grant such other and further relief as this Court may deem just and proper.


Respectfully submitted this 27th day of September 2023.

*/s/ Margaret E. Townsend*
Margaret E. Townsend (D.C. Bar No. OR0000008)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(971) 717-6409
mtownsend@biologicaldiversity.org

*/s/ Eric R. Glitzenstein*
Eric R. Glitzenstein (D.C. Bar No. 358287)
Center for Biological Diversity
1411 K Street, N.W., Suite 1300
Washington, DC 20005
(202) 849-8401
eglitzenstein@biologicaldiversity.org

*Counsel for Plaintiff*